UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| B.M.A., by and through her Mother and ) | |
| Next Friend, M.A.A., Natural and Legal ) | |
| Guardian of B.M.A., ) | |
| ) | |
|      Plaintiffs, ) | |
| ) | |
| vs. ) | Case No.  4:05CV01360 ERW |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
|      Defendant. ) | |

## MEMORANDUM AND ORDER

The matter comes before the Court on Marie A. Addison ("M.A.A.") and B.M.A.'s

Complaint under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq.* for damages upon

allegations of medical negligence during the period of labor of M.A.A. and forceps delivery of

B.M.A.  After a trial before the Court on April 30, 2007, the final brief of Defendant was filed on

October 31, 2007.  Pursuant to Fed. R. Civ. P. 52(a), the Court submits findings of fact and

conclusions of law.

## I.      FINDINGS OF FACT

M.A.A., the biological mother and legal guardian of B.M.A. brings this action on behalf of

B.M.A. as her Next Friend.  At approximately 4:15 p.m. on February 14, 2000, M.A.A., then

twenty years old, was admitted to Barnes-Jewish Hospital for induction of labor for delivery of

B.M.A., her first child.  Grace Hill Neighborhood Health Center ("GHNHC") is a federally funded

Community Health Care facility eligible for Federal Tort Claims Act coverage for medical services

performed by employees of the Public Health Service.  From approximately 9:45 a.m. through

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

approximately 3:30 p.m. on February 15, 2000, the Defendant was acting by and through M. Katherine Jahnige-Mathews, M.D., ("Dr. Jahnige-Mathews") an employee of GHNHC.

Dr. Jahnige-Mathews received her pre-medical degree at Yale, her Medical Degree at Harvard and her residency in obstetrics and gynecology at Northwestern University. She received a Master's degree in Public Health at Yale. After residency, Dr. Jahnige-Mathews came to St. Louis and a job at Grace Hill Neighborhood Health Centers. Of the several centers in St. Louis, the main office is in north St. Louis near Hanley and Interstate 70. (Tr. Vol.II P.96 L.7-25). She was a member of the Massachusetts Army National Guard until she began her residency. She attained the rank of Captain when her term of service was concluded. She received the Association of American Colleges' Herbert W. Dickens Award, recognizing her contributions for improving educational opportunities for students of minorities in health-related training and also improving the care for people from military backgrounds and other under-served patients. She was working full-time at Grace Hill when B.M.A. was born on February 15, 2000. She began her service there in 1998. She is Board Certified in obstetrics.

Since September, 2000, Dr. Jahnige-Mathews has been employed by Washington University School of Medicine, where most of her time is with St. Louis Connect Care as Chief Medical Officer, providing care to uninsured people. She is also an Associate Professor, primarily in the Obstetric and Gynecology Department. From 2000 to 2006, she created a number of programs for the Siteman Cancer Center. She currently works with the Center for Clinical Studies, coordinating research on human subjects for the medical school. She is one of six members on a steering committee creating a strategic plan for the school for the next ten years. She is Medical Director of the Recruitment Enhancement Core for Clinical Studies with

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

responsibility to enhance minority participation in clinical trials.  (Tr. Vol.II P.100 L.23-P.102 L.19).

Dr. Jahnige-Mathews delivered babies for Grace Hill when on call every Tuesday morning for twenty-four hours and one weekend each month.  Washington University's Obstetrical and Gynecological Department had an agreement with Grace Hill to do all obstetrical and gynecological care.  She had never met M.A.A. before the date of the delivery of B.M.A.  Dr. Jahnige-Mathews arrived at the Hospital around 9:45 a.m.  She first "viewed tracing," which means she looked at the fetal heart tone monitoring strip.  (Tr. Vol.II P.104 L.3-P.21; P.105 L.15-P.106 L.4; Gov. Ex. D P.24).  Dr. Jahnige-Mathews recalls little about the delivery, except she has a recollection "of the actual delivery with the reduction of the shoulder dystocia, and I have a memory that [ M.A.A.] wanted a c-section."  (Tr. Vol.II P.106 L.24-P.107 L.5).  During her internship and residency, Dr. Jahnige-Mathews was trained in the use of forceps extraction during vaginal delivery.  Dr. Jahnige-Mathews presents herself as a very believable witness.

In Count I of the Complaint, Plaintiff B.M.A. makes the following allegations of negligence by Dr. Jahnige-Mathews :

(a)     Jahnige failed to diagnose and treat plaintiff M.A.A.'s protracted dilation;
(b)     Jahnige failed to diagnose and treat plaintiff M.A.A.'s arrest of descent;
(c)     Jahnige failed to diagnose and treat plaintiff M.A.A.'s cephalopelvic disproportion;
(d)     Jahnige improperly used and improperly applied forceps at the time of plaintiff B.M.A.'s delivery;
(e)     Jahnige improperly used and improperly applied forceps at the time of plaintiff B.M.A.'s delivery after plaintiff M.A.A. exhibited multiple abnormalities of dilation and descent;
(f)     Jahnige used excessive force during the use and application of forceps at the time plaintiff B.M.A.'s delivery;
(g)     Jahnige failed to perform a caesarean section delivery.

(Complaint at p. 3).  M.A.A. seeks monetary damages on behalf of B.M.A. in Count I of the Complaint.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

In Count II of the Complaint, Plaintiff M.A.A. makes a claim for "reasonable value of the services, consortium, companionship comfort, instruction, guidance, training and support of B.M.A.," and for reimbursement for past and future medical expenses.

B.M.A. presents herself as a bright, self-assured, seven-year old child with a radiant smile. There is very apparent raised scar tissue just below her hair-line, primarily on her right forehead, extending laterally to the left side of her forehead, slightly beyond the mid-line if her face. There is scar tissue at the midline of the occiput[1] which is visible by manipulating the hair in an upward and a downward direction from the scar. The central issues in the case are whether the use of Simpson forceps by Dr. Jahnige-Mathews in the delivery of B.M.A. violated the standard of care and whether the injuries to B.M.A. were caused by the blades of the Simpson forceps.

The structural anatomy of the top of the skull of a fetus involves a soft place at the confluence two bony structures that come together at a point called the "fontanel" (Tr. Vol. I P.22 L.18-25). Plaintiffs' Exhibit 2 shows the position of a theoretical fetus in the ROA[2] presentation, with the face down, slightly towards the mother's left leg, and the recommended application of forceps. Dr. Jahnige-Mathews explained the importance of correctly locating the child's head prior to applying the forceps, because if the forceps are not applied to either side of the child's head, there is a risk that the forceps will "slip off." Her recollection of the particular application of forceps in this case is limited, but she testified that she "would have checked it [the identity of the location of B.M.A.'s head] immediately prior as well as during the application of the forceps." (Tr. Vol. I P.22 L.23-25; P.23 L.9-23). She said there were no obstacles in locating B.M.A.'s "suture lines on her head." She testified that B.M.A. was exhibiting "some

---

[1] The occiput is '[t]he back of the head." *Stedman's* Medical Dictionary 26th Edition.

[2] ROA means "right occiput anterior" (Tr. Vol.II P.116 L.21-22).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

degree of molding"[2] when she first looked to identify the head's location before application of the forceps, but it was not "moderate to extreme" in this case. (Tr. Vol. I P.24 L.4-11; L.21-25). She said there were no complications involving B.M.A.'s head prior to application of the forceps. She did not recall if there was "caput," or swelling on the top of her head. (Tr. Vol. I P.25 L.1-10; P.26 L.5-10).

Dr. Jahnige-Mathews described the application of the Simpson forceps by saying that the posterior blade, which rests on the right side of the baby's head, is applied first, to avoid rotating the head further to the side. She described her left hand as being inside the vaginal cavity which does most of the guiding of the blade. Because the blade is applied first, there are no bony structures "limiting you below." "The pelvic floor is all muscle, so you can actually move down with your hand to create more space there as you put that initial blade in." (Tr. Vol. I P.26 L.23-25; P.27 L.4-5; P.28. L. 13-16; P. 29 L.8-12; Pl. Ex. 4).[3]

The second blade of the forceps was applied in much the same way as the first blade. The nature of the location of the bony pelvis dictates the location for the initial application of the forceps:

> Q. Now, also explain to us, too, Doctor; why does a physician, in an ROA presentation such as this, start with the blades posteriorly or towards the front of the baby's head? And I think you've touched on it briefly. It's because of the pelvic wall. You can't slide for two reasons. Number one, you don't have the space, and number two, it's the design of the instrument. You can't just apply the forceps immediately to the side of the baby's skull, is that correct?
>
> A. Correct. You've also got -- that's where you have the bony pelvis.

---

[2] Molding means the suture lines are coming together

[3] In Pl. Ex. 4, blade two, not blade one is shown. In Pl.Ex. 7., blade one, not blade two is shown. Dr. Jahnige-Mathews made it clear in her testimony the order of application of the blades of the Simpson forceps, and explained that the diagrams do not comport with the manner in which the blades were applied by her (Tr. Vol. I P.34 L.16-18).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

| Q. | Correct. So both the blades have to go in the front no matter what you do or the bottom no matter what you do? |
|---|---|
| A. | Correct. |
| Q. | Also, concurrent with the application of the blades posteriorly, you have to move them and slide them towards the side of the baby's skull before they're in correct position to perform the delivery; is that not fair? |
| A. | Correct. |

(Tr. Vol. I P.34 L.20-23; P.35 L.14-P.36 L.6; Pl. Ex. 8).

Dr. Jahnige-Mathews testified that "[m]ost -- most of the bruising that occurs with forceps is after the blades are locked. Putting the blades in is not where there's significant risk." (Tr. Vol. I P.41 L.16-18). While Dr. Jahnige-Mathews testified that it is possible for there to be injury to a child's forehead with misapplication of forceps, which would involve both incorrect placement and incorrect technique in placement, but "[t]hat was not the case here." (Tr. Vol. I P.41 L.22-P.42 L.9; P.43 L.3). Dr. Jahnige-Mathews testified that she could identify no way the injury to B.M.A. could have occurred. "Q. So you have no medical explanation as to what caused this child's injuries? A. Correct." (Tr. Vol. I P.42 L.24; P.44 L.8-10). Dr. Jahnige-Mathews was asked about a record showing bruising to B.M.A.'s forehead and she testified, after a question was posited, "[n]ow, Doctor, you noted and we discussed at the time of your deposition that the pediatrician in attendance immediately after [B.M.A.'s] birth noted there was bruising across her forehead, is that correct? A. There is a notation of bruising." (Tr. Vol. I P.48 L.3-7 Pl. Ex. 21). After the delivery, Dr. Jahnige-Mathews first became aware that B.M.A. had scarring when she received something from B.M.A.'s and M.A.A.'s lawyer. (Tr. Vol. I P.54 L.2-5).

James Arthur O'Leary, M.D. ("Dr. O'Leary") testified as an expert witness for Plaintiffs. A resident of Naples Florida, Dr. O'Leary graduated from Georgetown University with an M.D. degree in 1961. He completed his five year residency at the Columbia Presbyterian Hospital in New York City. (Tr. Vol. I P.55 L.10-25). From 1967 through 1995, he was affiliated with

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

medical schools, with his last appointment as chairman of the Department of Obstetrics and Gynecology at Easton Hospital in Easton Pennsylvania, and he was professor at Temple University. He taught medical students, nursing students, student nurse-midwives and physician assistants. He is board certified in obstetrics and gynecology and the sub-speciality of maternal fetal medicine. He has been board certified since 1969. He has published over 186 works in medical journals. His main interest has been high-risk obstetrics. In making his opinions, his conclusions of negligence are by the standard of "failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of the Defendant's[4] profession." (Tr. Vol. I P.59 L.6-9). Dr. O'Leary believes that the "standard of care" is "established by basically a consensus opinion that develops over a period of time as it relates to each and every single clinical issue (Tr. Vol. I P.87 L.11-15).

Dr. O'Leary first performed a forceps delivery in 1959. He testified that forceps delivery was popular in the 1950's, 60's and 70's, but vacuum extraction became popular in the early 1980's. He has performed several hundred forceps deliveries. (Tr. Vol. I P.59 L.15-23; P.60 L.14-16). He testified that physicians, preparing to perform a forceps delivery, first do a digital examination to determine the position of the baby's head to avoid misapplication and consequent injuries to the baby's head, including mouth, eyes, ears and nose. Caput, swelling of soft tissue caused by duration of labor, can make the examination more difficult. Caput and molding can both cause some distortion in the examination process. The best way to be certain of the location of the baby's head is to feel the ears of the infant. (Tr. Vol. I P.62 L.4-23; P.63 L.2-4). He testified that in B.M.A.'s case, the caput was described as "large," which means there is

---

[4] The Court will assume he makes reference to Dr. Jahnige-Mathews and not the United States of America.

significant swelling in the baby's scalp. He also concluded that there was molding present. While the degree of molding was not noted in the record, Dr. O'Leary concluded that normal molding means the suture lines are coming together, which is not usually recorded, but abnormal molding is recorded. (Tr. Vol. I P.63 L.7; L.16-24). While Dr. O'Leary opines that B.M.A. had "abnormal molding," he admits there is no mention of "abnormal" or "excessive" molding in the medical records:

> Q.   I want to go into just the reasoning for your c-section analysis, and I may be winding up. Oh, I wanted to touch on -- I wanted to touch on -- we used the word "molding", and Mr. Guirl asked you about that record in E. You're of the opinion that there was excessive molding in this case?
> A.   Abnormal molding, that's correct.
> Q.   Abnormal molding, but you don't see the word "abnormal" used anywhere in these records, correct?
> A.   Correct.
> Q.   You don't see the word "excessive molding" anywhere in these records, correct?
> A.   That's correct.

(Tr. Vol. I P.116 L.5-16).

Dr. O'Leary describes the location of the left blade of the Simpson forceps as being in the left hand of the operator, being applied to the left side of the pelvis, placing the left blade over the forehead of the baby. The operator's hand is underneath the forceps blade to protect the mother's vagina. (Tr. Vol. I P.64 L.10-25; Pl. Ex.4). The right blade of the forceps goes in the operator's right hand and is applied to the right side of the mother's pelvis and it is then slid into place. At this time the operator locks the two handles together and uses the forceps to deliver the baby. (Tr. Vol. I P.67 L.17-P.68 L. 7; Pl. Ex. 7).

Dr. O'Leary testified that Dr. Jahnige-Mathews performed below the standard of care in the delivery of B.M.A., causing B.M.A. to sustain injuries to her forehead and occiput as a result of the improper application of the forceps. He concluded that the tip or toe of the forceps blade,

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

the leading edge, "caused the skin to be denuded and abraded."[5]  These are Dr. O'Leary's words!

This, in the Court's view, in the first signal of Dr. O'Leary's grasping of the banner of advocate

for Plaintiffs, and his abandonment as a witness of measured reasonable opinions that would be

helpful in trying to resolve the issues in this case.  His substitution of these words for bruising, is

unsupported by the record, as is his conclusion of injury to the occiput.  These unsupported

conclusions diminish the veracity and consequent weight of his testimony.

His second opinion that Dr. Jahnige-Mathews performed negligently in the delivery of

B.M.A. concerns his opinions that Dr. Jahnige-Mathews should have allowed M.A.A. to have a

longer period of labor before using forceps, and that Dr. Jahnige-Mathews should have performed

a c-section procedure to deliver B.M.A.  In expressing these views, he confessed that these

opinions were not causative factors in causing B.M.A.'s injuries.  Because Dr. Jahnige-Mathews

did not allow M.A.A. to continue in labor with a reduction in her epidural and an increase in her

Pitocin, Dr. O'Leary concludes this performance of Dr. Jahnige-Mathews fell below the standard

of care, although he did not conclude that this caused or contributed to cause the injuries to

B.M.A.'s forehead or the back of her skull.  (Tr. Vol. I P.74  L.2-6; L.12-19).

On cross-examination, Dr. O'Leary testified that in this case, when the forceps were

properly applied on both cheeks, "traction was done appropriately."  (Tr. Vol. I P.79  L.7-11).

For at least the last four years, Dr. O'Leary has been going to a clinic in Naples, Florida once each

week to practice gynecology.  His last delivery was in 1996.  Since 2000, he has done no

obstetrical care.  (Tr. Vol. I P.79  L.21-P80 L.12; P.80 L.20-25).  From 1990-1996, Dr. O'Leary

---

[5]  Stedman's *Medical Dictionary*, 26th Edition, defines "denudation" as "[d]epriving of a covering or protecting layer; the act of laying bare, as in the removal of the epithelium from an underlying surface."   "Abrade" is defined as "[t]o wear away by mechanical action. 2. To scrape away the surface layer from a part."

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

delivered about thirty babies annually with about three percent being forceps deliveries. From 1990 to the present time, he has performed about five forceps deliveries. (Tr. Vol. I P.83 L.2-13). He admits that he has not had hospital privileges for seven years, his last privileges being in Ft. Meyers, Florida, and that he is not familiar with obstetric practice in St. Louis. For the last six years, one hundred percent of Dr. O'Leary's income is generated from testifying as an expert witness, and ninety percent of the total comes from plaintiffs. (Tr. Vol. I P.84 L.16-P.85 L.13).

Dr. O'Leary admits that the fetal monitoring strips do not indicate that B.M.A. was ever in distress, and because B.M.A. was not in distress, he admits that there was no reason to do a c-section because of fetal distress. (Tr. Vol. I P.88 L.4-10; P88 L.16-22). The only damage he attributes to the negligence of Dr. Jahnige-Mathews is the scaring of the forehead and the scar on the back of the head. Dr. O'Leary appears to be saying that a reference in the medical record to "scalp abrasion" meant the abrasion to the back of B.M.A.'s head. However, in his earlier deposition testimony, he was asked, "[i]n fact, nowhere in these records is there any indication that there's any type of laceration or a cut or any type of injury on the back of this child's head, is that correct?" He answered, "[t]hat's correct." (Tr. Vol. I P.89 L.18-25;P.90 L.23-P.91. L.3). B.M.A.'s medical record on page 41 establishes that an "intrauterine growth and gestational age" shows a head circumference of 33.5 percent which Dr. O'Leary admits is not a really large head and B.M.A.'s weight puts her in the 50% range.

Dr. O'Leary demonstrates that he is not hesitant to speculate:

> Q. Now, are you still of the opinion that this baby was over -- would
> have been too big for this inlet?
> A. Either the size or the shape of the mother's pelvis.
> Q. But you don't know what the size or the proportion of the pelvis was, correct?
> A. That's correct.
> Q. It's not in the record, right?
> A. Correct.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

(Tr. Vol. I P.98  L.7-12).

Dr. O'Leary admitted that Dr. Jahnige-Mathews did not attempt to deliver B.M.A. with the forceps in the area of the scarring.  (Tr. Vol. I P.110  L.4-8).

Dr. O'Leary testified that there are two stages of active labor.  He admits that there was no cephalopelvic disproportion, protraction of labor, before 1400 hours, so before that time, there was no damage to B.M.A.'s head.  The "complete stage" starts the second stage of active labor, which means dilation of 10 centimeters; the time to start pushing.  In this case, that was at 1330 hours, or 1:30 p.m. on February 15, 2000.  (Tr. Vol. I P.119 L.18-23-P.120 L.12).   Dr. O'Leary testified that if a c-section had been performed, B.M.A. would have suffered no damage to her head.  (Tr. Vol. I P.119 L.24-P.120 L.2).  Dr. O'Leary offered the opinion that a c-section should have been performed at 1400 hours, or at 2:00 p.m., but since no c-section was performed at 2:00 p.m., Dr. Jahnige-Mathews' care fell below the proper standard of care, because if no c-section was performed, Dr. Jahnige-Mathews should have allowed M.A.A continue to labor for three hours instead of using forceps after two hours of labor, even though M.A.A. was morbidly obese, had poor maternal efforts at two hours of labor, had preeclampsia,[6] chorioamnionitis[7] and a fever. (Tr. Vol. I P.120 L.13-P.121 L.7).  He believes the epidural should have been gradually slowed so M.A.A. would have pushed stronger, but he admits that the medical record shows maternal exhaustion.  (Tr. Vol. I P.122 L.4-17).  He admits that when a person has chorioamnionitis, you want to get the baby out, "but it's not urgent.  It certainly is something you want to deal with over a short period of time."  He recognizes that there are more risks with a morbidly obese

_____

[6]  Preeclampsia is a combination of high blood pressure, protein in the urine, and swelling or edema.  (Tr. Vol.II P.21 L.5-8).

[7]  Chorioamnionitis is infection.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

patient weighing 348 pounds, including an increased risk of bleeding and controlling bleeding, increased anesthesia problems which sometimes requires insertion of an airway and wound dehiscence, suture lines failing. (Tr. Vol.I P.123 L.14-P.125. L.6).  He does not dispute that Dr. Jahnige-Mathews had to consider these risks and he does not suggest she did not consider these risks:

> Q.      Now, that's just preoperatively. Then postoperatively, these are -- these are -- these are the risks that -- and you would agree that these are the risks that Dr. Mathews had to consider and did consider in whether or not to do a c-section; you agree with that, right?
> A.      I do.
> Q.      You don't dispute that Dr. Mathews did not consider all of these risks involved, correct?
> A.      Correct.

(Tr. Vol.I P.124 L.5-13 and P.123 L.14-P.125 L.6).  Dr. O'Leary admits that B.M.A. had a secondary infection that was being treated with an antibiotic.  (Tr. Vol. I P.126 L.23-P.127 L.5).

On examination by Plaintiffs' counsel, Dr. O'Leary testified that it is unusual to quantify the forceps application.  Dr. Jahnige-Mathews charted a day after the delivery, "[e]asy forceps delivery."  She also noted, "one easy pull."  (Tr. Vol. I P.130 L.7-25).  He also says it is unusual for Dr. Jahnige-Mathews to retrospectively to write "[p]osition double-checked."[8]  (Tr. Vol. I P.131 L.1-10).  The "one easy pull" note is unusual because there was evidence of "shoulder dystocia," indicating the mother's pelvis was probably abnormal, indicating why the baby probably got stuck, and since it was a forceps delivery, shoulder dystocia is not encountered until the head is delivered.  Also, Dr. O'Leary testified that when there is shoulder dystocia, it usually is not

---

[8] Dr. O'Leary admits on re-cross examination that the delivery note was not written by Dr. Jahnige-Mathews, but instead, by a resident.  She corrected the note and made an addendum,  and because she wrote in shoulder dystocia, that is the only way it would have been known that this occurred. (Tr. Vol. I P.134 L.13-P.135 L.18).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

charted the next day, because this is an emergency where a child can asphyxiate or have permanent brain injury, unless the child is delivered in a timely manner. (Tr. Vol. I P. 131 L.11-P.133 L.7). He admits that shoulder dystocia is an unpreventable event and that Dr. Jahnige-Mathews managed it appropriately. (Tr. Vol. I P.134 L.8-12).

M.A.A., born November 26, 1979, is the mother of B.M.A. She was 19 when pregnant with B.M.A. (Tr. Vol. I P.137 L.7-22). She received regular prenatal care, starting the second month of her pregnancy, at GHNHC (Tr. Vol. I P.138 L.22-P.139-L.9). A nurse practitioner, Valerie Higginbotham, a licensed practical nurse, treated her before the delivery of B.M.A. (Tr. Vol. I P.139 L.1015).

When M.A.A. was admitted at Barnes-Jewish Hospital for the delivery, she learned that she had hypertension. She said that the doctors did not say the word, "preeclampsia,"[9] and did not say that it could effect the baby. (Tr. Vol. I P.139 L.24-P.135 L.7). On February 14, 2000, M.A.A. testified concerning Ms. Higginbotham, "I was overdue, and Valerie Higginbotham - - she induced my labor." She told M.A.A. that she needed to go to the hospital. (Tr. Vol. I P.140 L.16-22). When M.A.A. arrived at the hospital, she discovered that her blood pressure was high, and it needed to be treated before she could be induced. Her water broke, and a device was implanted to monitor the baby's heartbeat. She was given an epidural to help her with pain during contractions. On February 15, 2000, the doctors asked her to start pushing. She does not remember seeing Dr. Jahnige-Mathews before this time. Dr. Jahnige-Mathews told her to push, and after awhile, M.A.A. testified "I got tired and frustrated, and I asked her could I get a c-section because I kept pushing and nothing was happening. The baby would go out, come out, and then go back in." She said Dr. Jahnige-Mathews told her she could not get a c-section

---

[9] Preeclampsia is maternal hypertension.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

because the baby was too far down. She said forceps or suction was an option and she recommended the forceps. (Tr. Vol. I P.141 L.7-P.143 L.4). "It seemed like it took her a minute to place the forceps on. I couldn't really feel what she was doing because of the epidural." (Tr. Vol. I P.144 L.9-12). Once the forceps were put in place, M.A.A was asked to push "once," after which, B.M.A.'s head appeared. During this time, Dr. Jahnige-Mathews did not express concern about what was happening with the delivery.[10]

M.A.A. saw B.M.A. being passed to nurses. B.M.A.'s mouth was suctioned because she had eaten her stool. (Tr. Vol. I P.145 L.2-24). Her mother told her that B.M.A. was bruised. Before M.A.A. saw B.M.A., she saw a Polaroid photograph, and noticed no problems with B.M.A.'s forehead. (Tr. Vol. I P.146 L.14-22). M.A.A. learned that something was wrong with her forehead four days later when they were leaving the hospital. (Tr. Vol. I P.147 L.6-13). She saw a red mark across her forehead. The nurse told her that it was just a bruise and it would go away. She did not notice anything on the back of B.M.A.'s head because of her hair. She first noticed that B.M.A. had a mark on the back of her head "within a month." (Tr. Vol. I P.148 L.4-P.149 L.2). M.A.A. testified that her mother, a nurse, and her aunt, another nurse, told her that the mark on B.M.A.'s forehead was from the forceps. When she could get no help from the GHNHC, she took B.M.A. to Dr. Nash about two months after she took B.M.A. home. Within two months the "mark got darker on the front of her head. It was kind of like a dark purple bruise, and it kind of pussed up, and the mark on the back of her head - - it was scabby, pus used to leak out, and it had a real bad odor to it." (Tr. Vol. I P.149 L.4-23). When asked if a note from Dr. Nash was accurate that the place on B.M.A.'s forehead was a six-centimeter linear scar across the forehead, she responded:

---

[10] This testimony by M.A.A. is consistent with Dr. Jahnige-Mathews' testimony.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

> A. It wasn't like a scar. It was more -- it -- it was more pussed up like a wound more than like a scar. What she got now is the scar, but it was like -- it's kind of hard to put it in exact words, but when I took her there, it wasn't a scar just yet. It was like pussy and irritated looking, and I couldn't really, you know, touch it or brush her hair or nothing like that because it was -- it was -- it was just bad.

(Tr. Vol. I P. (Tr. Vol. I P.150 L.16-22). From the first time B.M.A. saw Dr. Nash, a pediatrician on April 21, 2000 until June 2000, M.A.A. testified:

> A. Okay. The first visit, they was pussy, and the scar on the top of her head -- it used to -- the pus used to drain down, and she used to keep an ear infection from the scar. All the way up until she was like four, four years old, she kept an ear infection from the scar. The back of her head -- it was pussy, it had an odor when we first went, and when I was rubbing a little cream on it after Dr. Nash gave it to me and trying to keep the back of her head clean, umm, that's when it started forming up as a scab, like a scar. When we went back, it was like healed, but it was like a scar more.

(Tr. Vol. I P.152 L.23-P.153 L.7). She said the pus kept draining into her ear until she was two. (Tr. Vol. I P.155 L.1-21).

Plaintiffs' Exhibit 45 represents the appearance of B.M.A. at two years of age. (Tr. Vol. I P.158 L.17-20; Pl. Ex. 45,46). Plaintiffs' Exhibit 47 shows the condition of the back of B.M.A.'s head at two years of age. (Tr. Vol. I P.159 L.4-8). Plaintiffs' Exhibit 51 represents the present condition of B.M.A.'s forehead. Plaintiffs' Exhibit 56 represents the present condition of the back of B.M.A.'s head. (Tr. Vol. I P.160 L.4-18). All of this testimony is consistent with the conclusion that the scarring to B.M.A.'s forehead occurred because of post-discharge care and it is inconsistent with any injury of B.M.A. that existed at the time of discharge from the hospital.

M.A.A testified that when B.M.A. went to school, "[s]he cried a lot and said the kids made fun of her and always talked about the scarring on her forehead, and she didn't want to go back to school." (Tr. Vol. I P.162 L.19-21). M.A.A. transferred B.M.A. from the Academy to

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Meadows Elementary because of the problem of other kids teasing her at the Academy. (Tr. Vol. I P.163 L.15-23). She attended pre-school at Grace Hill. "Kids used to push her there and hit her. They called her ugly and talked about the mark on her head, and so that's why I ended up taking her out of that school because it got worser there." (Tr. Vol. I P.164 L.20-23). M.A.A. testified the B.M.A. "has emotional problems to where she feels she's not pretty, and she feels she doesn't have any friends because of the scarring on her head because that's all they talk about when they play with her is what happened to your head and that's ugly . . ." (Tr. Vol. I P.165 L.5-9). M.A.A. expressed concern, because, "[i]t's everywhere we go. I mean we can go to the grocery store, and people come up to us and tell us she's a cute little girl and then ask what happened to her head." Dr. Nathan is going to try to "help the appearance of some of the scarring on her forehead and the back of her head." (Tr. Vol. I P.166 L.22-P.167 L.8).

On cross-examination, M.A.A. testified that when her deposition was taken on September 15, 2006, she remembers Mr. Llewellyn, Dr. Jahnige-Mathews's counsel, requesting photographs from the time of B.M.A.'s birth, but when he asked her in court to produce the photographs, she responded, "I don't have the photographs." Mr. Llewellyn asked her if she was telling the Court that she had no photographs of B.M.A. from the time of her birth until she was four months old. M.A.A. testified that she had a Polaroid photograph that was taken at he hospital at the time of B.M.A.'s birth, but she had a thing around her head that covered the mark on her head. M.A.A. has not produced any photographs of B.M.A. from the age of birth to four months. She testified:

> Q. You actually saw the mark on her head in the picture from the hospital, didn't you?
> A. The pictures that I took in the hospital, that I remember, yes, they -- but with the Polaroid pictures that they first brung up to me, the first picture that I got, her head was covered up; there wasn't a mark. When I got her pictures taken, they took like, I think, six pictures on a piece of paper, and you could kind of see the little red mark, now that I remember.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Q. So you took some pictures in the hospital, and in those pictures, you could see the mark on the head that we're talking about here at trial, right? Correct?

A. Uh-huh.

Q. Correct?

A. Yes.

Q. And those pictures are in your possession, correct?

A. No.

Q. Where are they?

A. Where I used to stay, we moved, and they got destroyed in the process of us moving.

Q. Okay. Did all your pictures get destroyed or just the -- just the first four months of life?

A. Umm, the majority of them. The pictures that I brung to Mr. Guirl, I got from family members.

Q. Did you -- when I asked for those pictures, in fact, do your family members have any pictures from the time of birth until four months old?

A. If they did, her head was covered in those pictures.

Q. Your mother was at the hospital that day, and they brought -- they had a picture of her holding the baby with a full frontal face, and in fact, you testified that in that picture, you could see the forehead and the bruising on the forehead. Remember that when I asked you that?

A. Yes.

Q. All right. Did you ask your mother where that picture is?

A. She -- she claims that her husband had them, and he moved since then, too, and I asked him for that picture, and he doesn't have them. He went through the boxes, and he claims he couldn't find them, the Polaroid picture.

Q. So we have no -- and the reason I'm asking you this, Ms. Addison [M.A.A.], is because we actually have no evidence whatsoever what this bruising looked like other than the fact that pictures were taken, they were in your possession, and we don't have them anymore, right?

A. Right, because the pictures that I did order, they only keep them for a certain amount of time, and I would have got some more.

Q. Now, I'm not going to belabor this point much longer, but when you saw the picture in the hospital, when you saw -- because the reason I'm asking you this is because when [B.M.A.] as taken immediately from you to the -- to the nursery, you didn't see her right away, right? Correct?

A. Correct.

Q. The first opportunity you got to see her was by picture, right?

A. Uh-huh.

Q. Correct?

17

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

A. Yes.

Q. All right. And in that picture, it looked to you like a purple mark and it looked to you like a regular bruise, correct?

A. I had my pictures mixed up.

Q. Well, let me just -- I don't want to get anything mixed up, and I just want to clarify to make sure that the question I asked is correct because when I took your deposition -- may I approach the witness, Your Honor?

THE COURT: Yes.

Q. (By Mr. Llewellyn) When I took your deposition on September 15th, 2006, I asked you this question prior to that testimony, and I said, "If I ask you a question and you answer that question as I asked it, I will assume that you have understood that question as asked," and you agreed with that, correct?

A. Correct.

MR. GUIRL: What page and line?

MR. LLEWELLYN: Well, I'm asking her that question first.

Q. (By Mr. Llewellyn) Correct?

A. Correct.

Q. Now go to page 67, bottom of 66. "Now, these pictures that I see right here on A and B and C -- let me ask you this. Was there any blood? No. It just looked like a regular bruise? Yes. Question: Just -- not an open wound, not a scar of any kind, just a bruise, right?"

A. That's where it started out looking like a bruise at first.

Q. At first, it was just a bruise, right? Correct?

A. Correct.

(Tr. Vol. I P.168 L.24-P.172 L.15).

M.A.A.'s testimony concerning destruction and unavailability of the photographs is not believable testimony, and is consistent with intentional non-disclosure of evidence that would not support her claim. When B.M.A. was released from the hospital, according to all testimony taken in a light most favorable to Plaintiffs, B.M.A. had an abraision on her forehead. The most believable testimony, supported by records, is that B.M.A. had a red mark on her forehead that

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

was improving at the time of discharge. There is no credible evidence in the record that B.M.A. had any injury to the back of her head[11] before her discharge from the hospital.

Defendant presents the testimony of Jacob Klein, M.D. who received his medical degree from Jefferson Medical College in Philadelphia, Pennsylvania. After a one year internship, he served a three-year residency in obstetrics and gynecology at Pennsylvania Hospital in Philadelphia. He currently serves as Chief of Obstetrics at Missouri Baptist Medical Center in St. Louis, and is also engaged in private practice. (Tr. Vol.II P.12 L.4-19). Last year, there were 4,158 babies delivered at Missouri Baptist Medical Center. Dr. Klein personally delivers between 100 and 130 babies each year. (Tr. Vol.II P.14 L.6-8). He is Board Certified in obstetrics and gynecology. Personal income generated as an expert witness is less than 1% of his total income. Dr. Klein met Dr. Jahnige-Mathews for the first time forty minutes before he testified. He testified that in his thirty-four or thirty-five years of experience, he has never seen a lineal injury across the entire forehead like the one represented in the three photographs he saw, and he has never seen an injury to the back of the head like the one represented on the photographs of B.M.A. (Tr. Vol.II P.20 L.6-20.)

---

[11] The Court has carefully examined all of the records and testimony in the case. There was never a reference in any medical record to an injury to the back of B.M.A.'s head for the days she was in the hospital. M.A.A. first noticed injury to the back of B.M.A.'s head "within a month" after B.M.A. was released from the hospital. Dr. O'Leary's attempt to transform three references in the medical record into an occiput injury is flawed. It is clear that there was bruising or an abrasion to B.M.A.'s forehead. If Dr. O'Leary's version of the facts should be embraced, i.e. that the reference to scalp abrasion meant occiput injury, there would be a reference to forehead bruising or abrasion and "scalp abrasion" in some record entry. The opposite is true. In every entry, there is only a single entry to either forehead bruising, forehead abraison(s) or scalp abrasion. The forehead bruising/abrasion improved while B.M.A. was in the hospital, but never totally disappeared. The Court agrees with the most credible evidence, that there was no injury to the back of B.M.A.'s head when she was discharged from the hospital, and that injury occurred post discharge.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

M.A.A., cramping, was admitted to the hospital for induction of labor, with preeclampsia, more than one week past her due date, with decreased amniotic fluid (oligohydramnious[12]). (Tr. Vol.II P.20 L.21-P.21 L4). M.A.A. was given the drug Pitocin to increase contractions. Dr. Klein described the first stage of labor as a progression of the cervix up until a patient achieves 10 centimeters of dilatation with the second stage being from the time the patient is 10 centimeters of dilatation until the baby is delivered. Stages of labor and phases of labor are separate terms. There is a latent phase of labor, when the patient is having contractions and making very slow progress in labor, and an active phase of labor is when the patient starts to dilate at least 1.1 centimeters an hour. (Tr. Vol.II P.21 L.24-P23 L.14).

Dr. Klein contests Dr. O'Leary's terminology and expert opinions. He disagrees that M.A.A. had cephalopelvic disproportion.[13] He testified that Dr. O'Leary did not know the definition of the latent phase of labor and the active phase of labor. Dr. O'Leary's definition of active phase of labor, when the patient hits three centimeters, according to Dr. Klein, exists nowhere in any medical literature. His second reason for disagreeing with Dr. O'Leary is that Dr. Klein believes, contrary to Dr. O'Leary, that M.A.A. never had a protracted phase of labor, but rather, she had a latent phase of labor. He testified that once she entered an active phase of labor, "she indeed progressed very quickly," and "I don't believe that you have protraction of labor in the latent phase of labor. I think you have protraction of labor in the active phase of labor, which this patient did not have." He testified that a c-section would be done if there was a protraction disorder and contrary to the opinion of Dr. O'Leary, Dr. Klein believed there was no

---

[12] Oligohydramnios is the presence of an insufficient amount of amniotic fluid. *See Stedmans Medical Dictionary* 26th Edition.

[13] Cephalopelvic disproportion means that there's a disproportion between the baby's head and the size of the mother's pelvis.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

protraction disorder and consequently a c-section was not indicated. He disagrees with Dr. O'Leary that there was a failure to progress because of the cephalopelvic disproportion, because once the forceps were applied, the patient was delivered with one easy push, and the baby came out. If there was cephalopelvic disproportion, the baby would not have come out with one easy push. Dr. Klein testified that cephalopelvic disproportion:

> [I]s a diagnosis that we make with hindsight, and the hindsight definition is if Dr. Mathews had attempted to deliver this baby with forceps or with a vacuum extractor or with pushing and the baby's head did not come out and fit through and then she had done a c-section, she may have coded that out as cephhalopelvic disproportion, but again, a definition made with hindsight.

(Tr. Vol.II P.24 L.3-P.26 L.16).

Dr. Klein further disagrees that shoulder dystocia, which "has to do with the size of the baby, the way the shoulders come down, the way they turn." He says that shoulder dystocia has nothing to do with the size of the pelvis, contrary to Dr. O'Leary's opinion. (Tr. Vol.II P.27 L.2-15).

He observed that Dr. Jahnige-Mathews became involved with M.A.A. at 9:45 a.m. and the baby "became complete" at 1330 when the second stage of labor began. With a first-time mother on an epidural, a protracted stage of labor, "according to the American College of Obstetrics and Gynecoogists' definition, . . . it would be prolonged if she was there more than three hours if she had an epidural or more than two hours if she did not have an epidural." He offered the opinion that Dr. Jahnige-Mathews could have allowed M.A.A. to labor until 1630 hours, or longer, but she delivered B.M.A. at 1530 hours. It was Dr. O'Leary's opinion that a c-section should have been performed at 1400 hours. Dr. Klein believes there was no indication to perform a c-section on M.A.A. then or at any other time because she made very adequate progress when she hit the

active phase of labor, it was only a half hour after she was completely dilated, and the baby's heartbeat was "okay."

C-sections create some risks, particularly in a patient that weighs 348 pounds; there is "more blood loss from a c-section, [there is] increased risk in future deliveries of a placenta attaching to the lower wall of the uterus . . . and potentially increase the risk for having a future hysterectomy." Additionally, an obese patient's incidence of having a wound infection is much higher, her incidence of having an infection in her uterus is higher, and, in this case, M.A.A. already had an infection in her uterus "as evidenced by a temperature elevation to 39.2 degrees centigrade." (Tr. Vol.II P.28 L.5-P.32 L.16).

Dr. Jahnige-Mathews described the placing of the forceps as "moderately easy forceps application," indicating to Dr. Klein that Dr. Jahnige-Mathews did not have difficulty applying the forceps correctly, and there is nothing in the record that Dr. Jahnige-Mathews forced the forceps in. (Tr. Vol.II P.38 L.1-6; L.24P.39 L.4; Gov. Ex. D P.29).

Dr. Klein observed that the pediatrician's newborn admission note describes an abrasion across the forehead and forceps marks on both cheeks. He believes that the marks on the cheeks indicate that the forceps were applied correctly. A nursing assessment flow chart makes reference to "bruising across the forehead, forceps marks on both cheeks, indicating Dr. Jahnige-Mathews had the forceps in the proper position when she delivered the head." (Tr. Vol.II P.39 L.5-24; Gov. Ex.E p.28; 46). Dr. Klein explains the issue of the laceration to M.A.A.

Q.   What does -- does that mean that there's trauma to the mom? What does that mean?
A.   A second degree vaginal laceration, which occurs in the midline from the bottom part of the vagina down towards the patient's rectum, is where -- when we used to do episiotomies all the time, which is a cut that we would do, that's exactly where we would do it, and a standard episiotomy would be a second degree midline episiotomy. A second degree tear that goes from the vagina down

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

towards the rectum is an everyday occurrence. That has absolutely
nothing to do with trauma. It's very common in first babies, and it's
the spot that is most likely to tear if you do not do an episiotomy.

(Tr. Vol.II P.45 L.14-20). Dr. Klein testified that he reviewed the entire medical record and saw

nothing referencing an occiput injury to B.M.A.

Dr. Klein was questioned after reviewing the infant records, noting there were several

references to bruising to B.M.A.'s forehead, with no references to any injury to B.M.A.'s occiput.

Page 28 of Defendant's Exhibit E records "abrasion across forehead," while page 29 notes

"abrasion, red discolored, across the forehead." Two days after the delivery, the note on page 64

records, "[b]ruises on forehead are resolving and skin intact." Dr. Klein testified that this means

that there was never a laceration of the skin. He says that "abrasion" means that the skin is

"irritated or bruised a little. . ." He stated that the pediatric record at 14 notes "[f]orehead, first

degree abrasion. Watch for infection." Dr. Klein testified that first degree means "the very

superficial layer is the first degree. . . If you went through the whole full thickness of your skin, it

would be second." (Tr. Vol.II P.45 L.22-P.48. L.13; P.49 L.15-P50 L.3). Dr. Klein testified that

the forehead is part of the scalp. He notes that page 72 of Defendant's Exhibit E, the discharge

summary, says "Bacitracin applied t.i.d. to scalp abrasion." Dr. Klein testified that in his review

of the medical record, at page 7 there is another reference to "[s]calp abrasion t.i.d." He believes

that the reference was to forehead, not to the back of B.M.A.'s head. (Tr. Vol.II P.51 L.6-52 L.

12).

Dr. Klein testified that the claimed injuries to B.M.A. were not caused by the forceps

delivery:

A.      I can tell you, in my opinion, that if you look at the anatomy, if you
                look at the pictures of the baby -- and I -- well, she wasn't a baby
                when I saw the pictures; she was probably four or five years old --
                that there is a linear lesion here; there's a linear lesion in the back of

her head. I have no idea where they came from. If I look at the medical record that says that there was bruising and abrasion, I don't know that you would get this line that went across because of that. There's hair loss in that area, which I certainly -- at least on the forehead of the baby, I have absolutely no explanation for whatsoever, but what I do know is I do know the anatomy, and I know that if I bring a model up here and I put forceps on this model, coming through the pelvis where the baby's head is, when you slip these on, there is absolutely no reason whatsoever and there's no physical way to get these forceps on the back of this baby's head in a normal anatomy and especially when this baby was ROA. So, no, I do not know what caused the injury, but in my opinion, I do know that the -- in my opinion -- that the forceps did not cause any injury.

Dr. Klein testified that as to the management of M.A.A. by Dr. Jahnige-Mathews,' "there

is absolutely nothing that was inappropriate about the way this patient was managed:

> Q. Do you have -- and in your opinion, do you have an opinion with a reasonable degree of medical certainty with regard to the care rendered by Dr. Mathews in this case?
> A. Yes. I think that the care rendered to the patient was absolutely, perfectly well thought out, well-executed, and ended up in a good result, which was that they got the baby out before the chorioamnionitis affected the baby, before the chorioamnionitis caused a real problem with her mom.
> Q. And one more follow-up on that. There's been some testimony that instead of using the forceps delivery at 1530 and pulling this baby out with one push and a pull, that the better way would have been to allow this mother to go another hour because there wasn't a prolonged labor, so let her go another hour, remove her epidural, and increase her Pitocin. Do you have an opinion with regard to that methodology?
> A. Yes.
> Q. What is your opinion with regard to that?
> A. I think it would have been an inappropriate medical decision –
> Q. And why is that?
> A. A -- for a number of reasons.
> Q. Well, what are those?
> A. The first, the first reason, was that this patient had preeclampsia. The treatment for preeclampsia is delivery. The second reason is that this patient had chorioamnionitis. She had evidence of an infection in her uterus. That infection could have been transmitted to the baby, so to subject the baby to an infected environment for another hour would be inappropriate, and number three is that what

happened here was that with an easy -- I'll quote the record -- with a moderately easy application of forceps and with one easy pull, this baby was delivered. So, in my opinion, there is absolutely nothing that was inappropriate about the way this patient was managed.

(Tr. Vol.II P.52 L.21-P.54 L.24).

On cross-examination, by Mr. Guirl, Dr. Klein testified that forceps can cause an injury to a child's head, and if forceps are misapplied and there is an injury, Dr. Klein agrees that does represent a deviation in the standard of care. He testified that his opinion as to whether the standard of care was met by Dr. Jahnige-Mathews is not based solely on her records at the time of delivery, saying, "My opinion is also based on the fact that when you have a baby that's ROA, it is physically impossible to bring the forceps onto that baby's head in the position where they were and lock them and cause an injury because the first -- well, that's my answer." He testified that if a physician misidentifies the position of the child's head in a mother's pelvis, using one blade of a Simpson's forcep, injuring the child's occiput while attempting to correctly place the forceps, that would be a deviation in the standard of care. (Tr. Vol. I P.63 L2-13; P.64 L.6-11).

Plaintiffs' Exhibit 23, the delivery record, shows an un-circled designation for "bruising." When asked by Mr. Guirl if "bruising" should have been circled, Dr. Klein responded, "[w]ell, considering that it says, 'Abrasion,'I guess it should have been." (Tr. Vol.II P.69 L.13-21; P.70 L. 14-22). Dr. Klein concluded that a finding of molding, which there was in this case, and the presence of large occipital caput[14] would not necessarily make it more difficult for a doctor to identify the location of a child's head in the mother's pelvis, and he could not tell, in this case, because he did not know if the posterial fontanel was easily detectable, but Dr. Jahnige-Mathews said the baby was ROA, she applied the forceps, and had she not been able to determine B.M.A.'s

---

[14] Caput is swelling between the skull and the skin. (Tr. Vol.II P.73 L.18-21).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

posterior fontanel, he does not believe that "the forceps would have ended up where they were." He noted that the record shows that Dr. Jahnige-Mathews double-checked it. Determining that the baby is ROA is from identification of the posterior fontanel. The primary determination in trying to identify the location of the child's head is the location of the posterior fontanel, "and if you can't tell, you look for the ears. You can't always tell." If Dr. Jahnige-Mathews used other anatomical markers, other than the posterior fontanel, that would not be a deviation from the standard of care, according to Dr. Klein. (Tr. Vol.II P.71 L.24-P.73 L.15).

While Dr. Klein could not give an opinion of what caused the injury to B.M.A.'s forehead or occiput, he did give an opinion that it was not caused by the forceps, because of the description of where the forceps were on the baby's cheeks, and because of the description that said it was a moderately easy application of the forceps. He testified that when a baby is ROA, there is no reason in the world why either blade would come close to the forehead or the occiput. (Tr. Vol.II P.76 L.5-18).

The morning after the delivery, Dr. Jahnige-Mathews wrote, "Grace Hill Clinic attending (late entry)." She also mentioned shoulder dystocia, the subsequent maneuver and that the baby's bladder emptied. (Tr. Vol.II P.80 L.22-25; P.81 L.22).

Dr. Klein testified that cephalopelvic disproportion has nothing to do with the shoulder. He said Cephalo means head, and a finding of shoulder dystocia does not necessarily indicate cephalopelvic disproportion. Shoulder dystocia shows that the shoulders came down at an angle that needed to be potentially corrected, but it has nothing to do with the pelvic size. (Tr. Vol.II P.84 L14-P.85 L.2).

Dr. Klein testified that he had talked to Mr. Llewellyn the night before he testified about the testimony of Dr. O'Leary, but he could not recall what Mr. Llewellyn told him about Dr.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

O'Leary's testimony. He continued to give the same response to questions of Mr. Guirl. (Tr. Vol.II P.85 L.23-P.88 L.2). Dr. Klein's testimony in all other respects was compelling, truthful and believable. This episode of absence of short term memory is peculiar considering the substance of all of the rest of his testimony.

B.M.A. was delivered from the ROA position. Mr. Guirl attempted to get Dr. Klein to give a hypothetical opinion based on pelvic placement of B.M.A. in a position other than ROA. He demurred! The injury to B.M.A.'s occiput is inconsistent with any plausible theory advanced by Plaintiffs and all of the physical and recorded evidence in the case. Dr. Klein offers a persuasive opinion as to why injury in application of one of the Simpson forceps to B.M.A.'s occiput would be impossible.

> Q. Well, I would ask you at this point to take that model and show the Court how it is impossible when the baby is in an ROA position, as it was in this case, to get the forceps from the front all the way to the back.
>
> A. This baby -- this is the pelvis, and this is the orientation of what happens with the baby. This is exactly the way the baby was. So a real baby, by the way, is a little bigger than this, but this is literally exactly what happens. So if you take this blade, okay -- and I'm sorry that it's a little small -- you -- there's no room for this blade to rotate this way. You hit a bone. It stops. That's why when I first got involved with this case, I feel real strongly about the fact that there's no injury. You can't get this blade around here in a real woman. It just won't work because it keeps hitting the pubic bone, so you can't get around to the back of the baby in the position that this baby's head was in. Okay. The other way that you can get to the baby is to go this way to get to the head, and you'd literally have to go through the baby's neck to make it end up this way. That's why, in my opinion, the whole thing is physically impossible to have this occur just because of anatomy. Because this baby was coming down this way, it goes right on the cheek and stays there. There would be no reason for any obstetrician in the world to move that off that spot.

(Tr. Vol.II P.94 L.10-P.95 L.8).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

On Government's Exhibit D, Dr. Jahnige-Mathews recorded "[p]atient comfortable with epidural. Positive chills. Temp 37.9."[15] She recorded "[u]terine contractions every two to three." "On 10 of Picocin ten units of oxytocin." She observed and noted "Fetal Heart tones, 150's. Positive LTV.[16] Audible skipped beats." She noted, "[o]ne decel of approximately one minute to 90. Sterils vaginal exam per nursing - - five, 100 percent effaced, 0+ station. Assessment and pain: induction for preeclampsia. On Pitocin and magnesium sulfate." Dr. Jahnige-Mathews explained that "mag" is used in patients with preeclampsia to prevent seizure, since preeclampsia can develop into eclampsia which is seizure and considered an obstetrical emergency. She testified that the record states, "[f]etal heart tones - - question - - consistent with premature atrial contractions? Overall reassuring."[17] (Tr. Vol.II P.107 L.10-P.108 L.23). Dr. Jahnige-Mathews then notes, "[r]equest peds for delivery." At 9:45 a.m., when she first saw M.A.A., she made the request for pediatric coverage "because I didn't know how to interpret the skipped heartbeats, and I wanted to make sure that someone with pediatric experience was there immediately upon delivery and in case this had a significance for the baby and how she was going to do immediately after birth." She recorded, "[i]ncreased temperature. On ampicillin and will start gentamicin for probable chorioamnionitis."[18] Then Dr. Jahnige-Mathews signed Government's Exhibit D. (Tr. Vol.II P.109 L.5-20). The record then shows that there was

---

[15] When asked if that was a high temperature, Dr. Jahnige-Mathews testified, "[w]e usually use a threshold of 38, but this was close enough in my medical decision making to go ahead and start additional antibiotics."

[16] LTV stands for "long term variability."

[17] "We had an appropriate baseline in between 120 and 160, and we have long-term variabilities - - variability. Even though we had one deceleration, it came back up."

[18] Chorioamnionitis is defined by Dr. Jahnige-Mathews as an infection within the bag of water where the baby is.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

decreased variability with magnesium, no deceleration, positive accelerations, a reassuring sign of fetal heart tones. Dr. Jahnige-Mathews made one correction on the record. "Mira Gopal called this an outlet forceps vaginal delivery, which is when the head is even lower than it was, and that was not accurate." The resident thought the head was at the +3 station instead of being at +2. The resident wrote "ROA." (Tr. Vol.II P.111 L.3-25).

Dr. Jahnige-Mathews testified that she did not misidentify B.M.A.'s head. She then explained how she identified the posterior fontanel:

> Q.   Can you explain to the Court how it is that you did not or how you believe you did not misidentify the baby's presentation?
> A.   May I use the baby?
> Q.   Sure.
> A.   We've talked a lot about the posterior fontanel, and this is the easiest, simplest place to start with an exam.
> Q.   You may want to hold it up a little higher for the Court.
> A.   One feels this "V" here, and that tells you where the back of the head is, but I tend to be very thorough with my exams. This "V" here can feel like the anterior fontanel, which also has a "V". The difference here is you can feel a full diamond. So just typically, although I don't specifically remember in this case, I have a sequential series of steps, which would be to start here to see if I could feel back far enough to make sure that there is no diamond, that it's actually a triangle, and then also, because my hands are small, I have the ability, although I don't specifically remember here, to feel the baby's ears, and then one can come anteriorly to feel for this diamond in the front.

(Tr. Vol.II P.112 L.17-P.113 L.11). In response to a question by the Court, she confirmed Dr. Klein's conclusion that it is impossible to place the blade of the forcep at the location where Dr. O'Leary opined that B.M.A.'s occiput was injured by a forcep blade:

> THE COURT:   Question. One of the -- one of the maneuvers that Dr. Klein made was to demonstrate that it was impossible to place the blade going to the right side of the baby's head up over the top of the head because of pelvic interference, and it seemed clear here that you could place your fingers in that location. Is -- what am I missing there?

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

THE WITNESS:    What you can get to is about here. Sometimes it's -- and I don't specifically remember everything I could feel in this case, so I don't remember if I could specifically feel that far back, but you can feel this "V" here. This is coming right -- it's what we call the pubic symphysis. So the pubic bone or the pubic arch comes down like that. So I'm able to feel, you know, kind of pre to that, but the idea -- if I could get a forceps for a second? So -- so my finger can get to here, but the idea that then you could have this width pass back here in between the head and the pubic symphysis is where we come into that impossibility of moving the forcep back here.

THE COURT:    All right.

(Tr. Vol.II P.113 L.12-P.114 L.5)

Dr. Jahnige-Mathews explained that she wrote a note at 10:20 the next morning for two reasons. "One has to do with clarity and thoroughness for billing. I did this delivery, but for it to be billed under my name - - this resulted from a hospital at the University of Pennsylvania lawsuit back in the nineties. I can't bill for that delivery if I don't demonstrate in the medical record that I was substantially involved in the critical parts of the care, and part of that documentation is documenting more in the medical record. . ." (Tr. Vol.II P.114 L.L.14-P.115 L.7; Gov. Ex. D P.29). The entire note is read and explained: as follows:

Q.    Okay. So let's go through your late entry here, 3-16 (sic) 10:20, and describe this note, read the entire note, and why whatever is written is written.

A.    "Grace Hill attending" -- parenthesis -- "(late entry)", so in that case, I'm making it clear that I wrote that the next day.

Q.    Uh-huh.

A.    "Delivery as above," so I'm referring back to Dr. Gopal's note. "Post," meaning after, "one and a half hours maternal pushing, minimal further descent," and I mean minimal further descent of the head into the pelvis. "+2 station." So if I recall correctly, when we began pushing, the documentation was 0+ plus, and now we're at +2, so the baby has come down. "ROA," which we've talked about before, right occiput anterior, and then this is a typical forceps note for me. "Bladder emptied. Moderately easy" -- I mean it's typical in the outline, and then the particulars are that in this case it was a moderately easy forceps application. When I say, "Position double-checked," what I really -- what I intend in that documentation is that I'm double-checking the location of the

border of the forcep against the posterior fontanel. If you get it off by just a little bit, the forcep can actually come down over the baby's eye, so that's why I'm methodical about checking where the forceps are in relation to the fontanels once they're on there and locked.

Q.     And in this case, there's evidence that you've heard that the forcep marks on the cheeks, they were in the proper place?

A.     Right, on both sides. "Delivered with one easy pull. Moderate shoulder dystocia." I know we talked about this before. I haven't put a time on that. "Attempt with delivery posterior arm," which I was not able to do. "Actual delivery with McRoberts," which is the flexion of the legs up and back, which is thought to open up that aperture, and "Rotation," which is a Woods rotation, Woods corkscrew of the infant, and what I mean by that is that that is what ended up reducing the shoulder dystocia, and then I note that peds assessed at delivery.

Q.     Okay. So while Dr. Gopal didn't put the shoulder dystocia information, didn't put the application of the forceps -- and I don't even know if it's a female or a male.

A.     She.

Q.     While she didn't put it in her note, you put it in your note?

A.     Correct.

(Tr.Vol.II. P.116 L.8-P.118 L.1).

Dr. Jahnige-Mathews testified that she did not believe a c-section was indicated; there were no protraction disorders, and no fetal status which would have required an immediate c-section. She conferred with M.A.A. about the options. Dr. Jahnige-Mathews was familiar with a California study in 1999 of 80,000 women on the association between birth trauma and method of delivery, comparing c-section, vacuum delivery, and forceps delivery. From a baby standpoint there was no advantage to doing a c-section. From a mom point of view there were substantial infection risks - M.A.A. was morbidly obese (wound healing and it is not simple surgery in someone with this kind of body mass index). (Tr. Vol.II P.119 L.8-P.120 L.12). A nurses' note stated that the patient was frightened. M.A.A. testified that when she first went into the hospital, she wanted a c-section.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

At 1330 hours, M.A.A. was in active labor stage. At 1400 hours, there is a note, "[s]he's pushing well. Head slow to descend." At 1430, the head was visible. At 1500 hours, the note reads "[m]aternal fatigue setting in. Not moving head as well." (Tr. Vol.II P.124 L.3-24; Gov. Ex. D P.111). At 1515, fifteen minutes before the baby was delivered, Dr. Jahnige-Mathews had a conversation with M.A.A. about assisted delivery. Two or three minutes into the conversation M.A.A. accepted use of the forceps, someone was sent for the forceps, pediatricians were called, Dr. Jahnige-Mathews put on sterile boots, hat, mask, gown and gloves. Once the pediatricians were in the room, the process to place the forceps was indicated. The pediatrician note indicates that at 1520 the pediatricians were notified. (Tr. Vol.II P.128 L.9-P.130 L.25; Pl. Ex. 20 P.17).

Dr. Jahnige-Mathews describes the application of the forceps by concluding that the ROA presentation had been determined, "[w]e have the posterior fontanel anterior. We have the sagittal suture running in a diagonal. I can feel that directly on top of the baby's head. . . I put on the right blade first." She then demonstrated to the Court how she placed the other blade. M.A.A. could not feel the contractions, so the monitor was used to determine when there were contractions. Upon a requested push by M.A.A., using traction with her right arm and pushing down with her left hand to bring the head under the pubic bone, the head is moved out. When the head is out, the blades immediately come off. She noticed that the shoulder did not come out completely. She tried to reach in and deliver the posterior arm. When she was not able to do this quickly, she asked M.A.A. to flex her knees back, rotated on the back of the baby which pushed the shoulder far enough forward so it could slide under the same pubic bone. The baby came out, she clamped and cut the cord and she handed the baby to the pediatricians. (Tr. Vol.II P.131 L.22-P.132 L.15; P.133 L4-P.134 L.25).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Dr. Jahnige-Mathews disputes Dr. O'Leary's opinion that she forced the forceps blades into M.A.A.:

> Q.  And what is your feeling with regard to his testimony that you, Dr. Mathews, forced these forceps into Ms. Addison [M.A.A.] to deliver this child?
> A.  Well, it's not accurate. One has to take great care and be deliberate and methodical in applying forceps. It's -- it's a smooth series of movements that allow you to get in at the base and then slide up along the pelvic side wall. So it's just not an accurate portrayal of what happened.

(Tr. Vol.II P.137 L.10-17)

Even if the baby was in the LOP position[19], which fact Dr. Jahnige-Mathews categorically denies, the injury to B.M.A.'s occiput, she persuasively testifies, could not have been caused by the forceps:

> A.  The way the forceps are going in, no. They're smooth along the floor of the pelvis, and then they're coming up the side wall of the pelvis on both sides. That, I think -- anyway, the way the scar is, that looks like a direct perpendicular -- it looks like something like that, and you never get that angle with the forceps.

(Tr. Vol.II P.138 L.7-12)

On cross-examination, Dr. Jahnige-Mathews said she had never heard Dr. Klein's name before. The first time she saw him was "this morning shortly before 8:00 a.m. outside, and I walked over, said hello, and shook his hand, and that was the extent of the interaction." (Tr. Vol.II P.140 L.1; L.19-25). Dr. Jahnige-Mathews testified that she remembers "the actual delivery itself and the shoulder dystocia, and as I - - and even that is partial, and then I have this memory of [M.A.A.] being interested in having a c-section." (Tr. Vol.II P.142 L.11-14).

---

[19] In the LOP (left occiput posterior) position, the bottom of the baby's head would be towards the floor (Tr. Vol.II P.159 L.12-15).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Dr. Jahnige-Mathews was asked about changing the notes in the record made by Dr. Gopal, a second year resident. She admits changing the level of the delivery verses outlet verses lower forceps, but did not change Dr. Gopal's note which reflected the language "prolonged second stage." (Tr. Vol.II P.149 L.22-P.150 L.4; Pl. Ex. 62-63).

The pediatricians noted positive bruising horizontal along the forehead at 1520. (Tr. Vol.II P.151 L.23-P.152 L.11). Dr. Jahnige-Mathews was unaware of the bruising to B.M.A.'s forehead when she made the correction note at 10:20 a.m. the morning after the delivery. (Tr. Vol.II P.157 L.18-L.2).

At 1515 (there is another reference to 1520), the call was made to the pediatricians and they arrived at 1520. Dr. Jahnige-Mathews testified that she would not have started the delivery until the pediatricians arrived. Upon being asked if she started the delivery shortly after they arrived, she confirmed that she had a ten minute period to deliver B.M.A. She explained, "[w]hat we know is that the baby delivered at 1530 and that I delivered her over one contraction and that contractions typically last less than a minute, and so I would have begun the traction at 1529." (Tr. Vol.II P.159 L.14-P.160 L.7). Dr. Jahnige-Mathews testified, "[m]y best estimate is that all happened within two minutes." (Tr. Vol.II P.166 L.23-24).

The last question asked by Mr. Guirl on cross-examination was, "[c]an a physician in the application of forceps injure a child's forehead and occiput?" (emphasis supplied). Dr. Jahnige-Mathews said "[n]o" (Tr. Vol.II P.171 L.13-16). Initially the Court concluded that this response diminished her otherwise credible, responsive, believable and informed testimony. However, upon further examination of Mr. Guirl's question, the Court agrees with her conclusions, and Dr. Klein's conclusions, that causing the injury to the back of a baby's head, like the injury to B.M.A., with the use of Simpson forceps, when the child is in the ROA position, and with the same

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

dimensions of the baby's head and the mother's pelvis, is impossible. The Court disagrees that it is impossible for a physician to injure a child's forehead applying forceps, and if that was the question posited with Dr. Jahnige-Mathews, her testimony, in the Court's view, with the answer she gave, would be significantly diminished. However, when the question was asked by opposing counsel, he asked, "[c]an a physician in the application of forceps injure a child's forehead and occiput? Yes or no?" Dr. Jahnige-Mathews answered "[n]o. (Tr. Vol.II P.171 L.13-16). To answer the question any other way, because it combined injury to the forehead and occiput in the conjunctive, her prior testimony would have been inconsistent. She was not given an opportunity to explain her answer, by the parameters given. She has admitted, earlier in her testimony at page 6 of this opinion, that injury to a child's forehead can occur when forceps are misapplied. Dr. Jahnige-Mathews testified that "[m]ost -- most of the bruising that occurs with forceps is after the blades are locked. Putting the blades in is not where there's significant risk." (Tr. Vol. I P.41 L.16-18). Dr. Jahnige-Mathews testified that it is possible for there to be injury to a child's forehead with misapplication of forceps, which would involve both incorrect placement and incorrect technique in placement, but "[t]hat was not the case here." (Tr. Vol. I P.41 L.22-P.42 L.9; P.43 L.3). Her answer to opposing counsel's last question is consistent with her earlier testimony.

The Court finds, by a greater weight of the evidence, that neither B.M.A.'s forehead injury or the injury to her occiput were caused by placement of the Simpson forceps by Dr. Jahnige-Matthews, and there is no credible evidence that any care given by Dr. Jahnige-Matthews to M.A.A. in any respect fell below the standard of care in this case. The credible evidence shows that the injury to B.M.A.'s occiput and her forehead were post-delivery injuries complicated by inappropriate sanitary care.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

## II.    CONCLUSIONS OF LAW

M.A.A. brings this action pursuant to the Federal Tort Claims Act.  *See* 28 U.S.C. §§ 2671 *et seq.*  United States of America is the properly named defendant in this action, as Dr. Jahange-Mathews was an employee of a federally-funded clinic.  Employees of federally funded clinics who act within the scope of their duties are eligible for Federal Tort Claims Act coverage under the Federally Supported Health Centers Assistance Act of 1992.  Dr. Jahnige-Mathews acted within the scope of her duties under all of the facts and circumstances of this case.

When an action is brought pursuant to the Federal Tort Claims Act, a court will apply the law of the state in which the complained of acts occurred.  *See Goodman v. United States*, 2 F.3d 291, 292-93 (8th Cir. 1993); 28 U.S.C. § 1346.  As the actions complained of took place in St. Louis, Missouri, the Court will apply the Missouri law to these claims.  In Missouri, a plaintiff in a medical malpractice action, "must prove that defendants failed to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of defendants' profession and that their negligent act or acts caused plaintiffs' injury."  *Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611, 615 (Mo. banc 1995); *McBurney v. Cameron*, 2008 WL 169345, at *9 (Mo. Ct. App. January 22, 2008).

The Court looked specifically at the precise allegations of negligence by Plaintiffs against Dr. Jahnige-Mathews in Plaintiffs' Complaint.  The Court concludes that Plaintiffs fail to meet their burden of proof that Dr. Jahnige-Mathews failed to diagnose and treat plaintiff  M.A.A.'s protracted dilation; that she failed to diagnose and treat plaintiff M.A.A.'s arrest of descent; and that there was neither cephalopelvic disproportion, nor that Dr. Jahnige-Mathews failed to diagnose and treat plaintiff M.A.A.'s cephalopelvic disproportion.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

The issues in this case center on whether Dr. Jahnige-Mathews improperly used and improperly applied forceps at the time of B.M.A.'s delivery; whether Dr. Jahnige-Mathews Jahnige improperly used and improperly applied forceps at the time of B.M.A.'s delivery after M.A.A. exhibited multiple abnormalities of dilation and descent; whether Dr. Jahnige-Mathews used excessive force during the use and application of forceps at the time of B.M.A.'s delivery, and whether Dr. Jahnige-Mathews failed to perform a caesarean section delivery. The Court finds that Plaintiffs fail in their burden of proof as to any allegations of negligence against Dr. Jahnige-Mathews.

The most credible evidence presented to the Court demonstrates that there was no cephalopelvic disproportion. The Court believes the testimony of Dr. Klien, who stated that if there was cephalopelvic disproportion, the baby would not have come out with one easy push. Shoulder dystocia "has to do with the size of the baby, the way the shoulders come down, the way they turn," and has nothing to do with the size of the pelvis. Shoulder dystocia does not indicate cephalopelvic disproportion. As there is no credible evidence of cephalopelvic disproportion, there is also no credible evidence that Dr. Jahnige-Mathews either failed to diagnose or failed to treat plaintiff M.A.A.'s cephalopelvic disproportion. In any event, there is no showing that this was in any way a cause of B.M.A.'s injuries.

The Plaintiff has failed to introduce credible evidence that Dr. Jahnige-Mathews was negligent in failing to perform a c-section. Even Dr. O'Leary, expert witness for Plaintiffs, admits that B.M.A. was not in fetal distress, and there was no convincing reason to do a c-section. Additionally, there were several reasons why a c-section would have been inappropriate. Dr. Klein testified that c-sections create additional risk, particularly in a patient that weighs 348 pounds; there is more blood loss from a c-section, there is increased risk in future deliveries of a

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

placenta attaching to the lower wall of the uterus, and potentially an increase in risk for having a future hysterectomy. Dr. Klein also noted that an obese patient's incidence of having a wound infection is much higher, and the incidence of having a uterine infection is higher. The evidence presented to the Court demonstrates that in not performing a c-section, Dr. Jahnige-Mathews followed the course of treatment recognized as correct by the profession.

B.M.A. was delivered from the ROA position. Dr. Jahnige-Mathews testified to this fact, and it was detailed in the medical records. No credible evidence has been presented that B.M.A. was in any other position. The evidence shows that M.A.A. was experiencing maternal fatigue as the labor progressed. At 1500 hours, the note reads "[m]aternal fatigue setting in. Not moving head as well." (Tr. Vol.II P.124 L.3-24; Gov. Ex. D P.111). M.A.A. also had preeclampsia and chorioamnionitis. As a result, the intervention with forceps at that time was appropriate.

The evidence also demonstrates that the forceps were appropriately applied. Dr. Jahnige-Mathews has an established practice for determining the proper placement of the forceps, and M.A.A. testified that "[i]t seemed like it took her a minute to place the forceps on," which indicates that Dr. Jahnige-Mathews followed her established practice of:

> [feeling] this "V" here, and that tells you where the back of the head is, but I tend to be very thorough with my exams. This "V" here can feel like the anterior fontanel, which also has a "V". The difference here is you can feel a full diamond. So just typically, although I don't specifically remember in this case, I have a sequential series of steps, which would be to start here to see if I could feel back far enough to make sure that there is no diamond, that it's actually a triangle, and then also, because my hands are small, I have the ability, although I don't specifically remember here, to feel the baby's ears, and then one can come anteriorly to feel for this diamond in the front.

(Tr. Vol.II P.112 L.17-P.113 L.11; Tr. Vol. I P.144 L.10-11). Additionally, the Court is convinced that the forceps were properly placed as the delivery was accomplished with "one easy pull" and the pediatrician's newborn admission note describes forceps marks on both cheeks.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

"Members of the medical profession are 'entitled to a wide range in the exercise of . . . [their] judgment and discretion and . . . [can]not be found guilty of negligence 'unless it be shown that the course pursued was clearly against the course recognized as correct by the profession generally.'" *Shelton v. United States*, 804 F.Supp. 1147, 1158 (E.D. Mo. 1992) (internal citations omitted). The evidence presented to the Court demonstrated that the course of treatment Dr. Jahnige-Mathews pursued was recognized as correct by the profession, and she was not negligent. The evidence in no way shows that she failed to use the degree of skill and learning ordinarily used under the same or similar circumstances by members of her profession.

The unexplained bruising or abrasion on the forehead does not result in a conclusion that the injury was caused by the forceps. There is no evidence the occiput injury was caused in the delivery. In B.M.A.'s medical records, there is only a single entry to either forehead bruising, forehead abraison(s) or scalp abrasion. The forehead bruising/abrasion improved while B.M.A. was in the hospital, but never totally disappeared. The Court agrees with the most credible evidence, which is that there was no injury to the back of B.M.A.'s head when she was discharged from the hospital, and that injury occurred post discharge. The bruising to her forehead was appropriately healing upon discharge, and the injury as it now appears resulted from causes after the discharge. Judgment for Defendant.

Accordingly,

**IT IS HEREBY ORDERED** that judgment is ordered in favor of Defendant.

An appropriate Order of Judgment shall accompany this Order.

Dated this <u>12th</u> day of <u>February</u>, 2008.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

PDF created with FinePrint pdfFactory trial version www.pdffactory.com